# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| CHANTRESS M. BIRTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 3:11-CV-430 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant, | ) | |

## **OPINION AND ORDER**

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits to Plaintiff, Chantress M. Birton.  For the reasons set forth below,  the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).


BACKGROUND

On March 6, 2008, Plaintiff, Chantress M. Birton ("Birton"), applied for Social Security Disability Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 423.  Birton alleged that her disability began on December 28, 2006.  The Social

1

Security Administration denied her initial application and also denied her claim on reconsideration. Plaintiff requested a hearing, and on April 29, 2010, Plaintiff appeared in person, represented by counsel, at an administrative hearing before Administrative Law Judge ("ALJ") Steven J. Neary. Testimony was provided by Birton and Dr. Leonard Fisher, a vocational expert ("VE"). On August 9, 2010, ALJ Neary issued a decision denying Birton's claims, and finding her not disabled because she did not have a listing-level impairment or combination of impairments that equaled one of the listing-level impairments.

Plaintiff requested that the Appeals Council review the ALJ's decision, but the request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a). Plaintiff has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).


Medical Evidence

Birton was born in 1971, and was 39 years old at the time the ALJ rendered his decision, and 35 years old at the time of onset. (Tr. 264.) She alleges disability due to back problems which made it difficult for her to stand or sit for prolonged periods of time (Tr. 30-32), and complains of problems with her right hand, drowsiness and difficulty concentrating due to medications,

depression, migraine headaches, asthma, and pain from fibromyalgia in her neck, back, hips, arms and legs. (Tr. 31, 33, 39-45.)

In July 1996, Dr. Rayna Jobe evaluated Birton for chronic back and pelvic pain, and diagnosed her with a 2 cm leg length discrepancy, chronic left sacroilias ("SI") joint inflamation, trochanteric bursitis, possible interstitial cystitis of the bladder, and left carpal tunnel syndrome. (Tr. 700.) Dr. Jobe recommended physical therapy and various non-steroidal anti-inflammatory drugs. *Id.*

Plaintiff then started physical therapy with Dr. In Kwang Yoon, a physiatrist, on November 4, 1996. (Tr. 406.) His examinations revealed severe paraspinal muscle spasms in the lumbar area associated with tenderness at the bilateral SI joint. *Id.* Dr. Yoon also recommended outpatient physical therapy. *Id.* Following 4 years of physical therapy, Birton was re-evaluated by Dr. Yoon on October 16, 2000. (Tr. 641.) At that time, he found that Birton had a recurrent left SI sprain and residual left costochondritis and costovertebral synovitis at the level of T8, T9, and T10. *Id.*

Dr. Margit Chadwell diagnosed Plaintiff with asthma, chronic urinary tract infections, urethral construction s/p dilation, left trochanteric bursitis, cervical dysplasia, allergic rhinitis, chronic back pain, and a history of carpal tunnel syndrome on March 30, 2001. (Tr. 469.) Dr. Chadwell also conducted a physical

3

medical assessment, opining that Birton could lift 10 pounds, stand and/or walk for less than 2 hours in an 8-hour workday, sit with periodic alternation of sitting and standing to relieve pain, and never pull. (Tr. 466-67.) Dr. Chadwell also found that Birton had limited reaching, handling, fingering, and feeling functions. (Tr. 468.) She further noted these limitations were based on Birton's chronic low back pain, recurrent sacroilitis, and hand numbness. (Tr. 467-68.)

A DDS-selected physician, Dr. L. Banerji, conducted a consultative examination of Birton on October 23, 2001, for her Social Security claim. (Tr. 508-11.) Birton complained of chronic back and pelvic pain, urinary tract problems, a leg length discrepancy, pain in the left knee and ankle, and carpal tunnel syndrome. (Tr. 508.) During the exam, Dr. Banerji noted bronchial asthma, an inability to squat more than 80% due to lower back pain, a questionable shortening of the left lower extremity (but it did not interfere with her daily activities or walking), and no abnormal physical finding related to carpal tunnel syndrome. (Tr. 511.)

Then, on November 2, 2006, Dr. Sarah Jacob, Birton's treating physician, diagnosed Birton with fibromyalgia. (Tr. 347.) Dr. Jacob also diagnosed her with hyperlipidemia, persistent constipation, asthma, mastalgia, and chronic obstructive pulmonary disease ("COPD"). (Tr. 340-48, 386.)

4

Dr. Jacob referred Plaintiff to Drs. Jeffrey Kirouac and Dominick Lago, Jr., Michigan Pain Management consultants. (Tr. 368.) On August 30, 2007, she presented to them with a long history of lower back pain and left leg pain. *Id.* Birton began getting lumbar epidural steroid injections from Dr. Kirouac which continued into early 2008. (Tr. 374-78.)

On October 28, 2008, Plaintiff started treatment with Dr. Ralph Carbone, complaining of low back pain and neck pain radiating in her arms. (Tr. 968.) An MRI of the lumbar spine showed the following: slight straightening of the normal curvature of the lumbar spine secondary to muscle spasm or positioning, a mild edema of the spinous processes at the L3 and L4 levels, a mild edema of the interspinous intervals at the L3-L4 and L4-L5 levels compatible with mild degenerative change or mild sprains of interspinous ligaments, minimal bulging of the disk material without significant impingement upon the thecal sac at L5-S1, and mild to moderate diffuse bulging of the disk material that was greater posterolaterally on the right at L4-L5. (Tr. 961.) There was also an annular fissure posterolaterally on the right, with mild impingement upon the thecal sac and mild bilateral foraminal stenoses slightly greater on the right at L4-L5. (Tr. 961.) Following the MRI, Birton continued to receive lumbar epidural steroid injections from Dr. Carbone and do physical therapy at South Bend Orthopaedics, which slightly improved her pain. (Tr.

876-913, 950, 966, 970.)

On April 30, 2008, a non-examining State Agency ("SA") reviewer, William Lockhart, checked off boxes on a physical residual functional capacity assessment ("RFC") form opining Birton was able to occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk 6 hours of an 8 hour work-day, and push or pull unlimitedly. (Tr. 763.) He noted no postural, manipulative, or visual limitations. (Tr. 764-65.) The non-examining SA did not have a treating or examining source statement regarding the claimant's physical capacities on file. (Tr. 768.)

On March 16, 2009, Birton had a Lumbar Myelograme and Postmyelogram CT. (Tr. 837.) The radiology report indicated a diffuse posterior disc protrusion at L4-L5 with associated buckling and thickening of the ligamentum flavum bilaterally and a relatively congenitally small canal. *Id.* Overall, this caused moderate central canal stenosis at L4-L5 with mass effect and decreased filling of the right traversing L5 nerve root sheath and potentially the left traversing L5 nerve sheath as well. *Id.* Dr. Carbone recommended Birton undergo a fusion operational procedure by Dr. Henry DeLeeuw for decompression of L4-L5 consisting of laminectomy L4 and L5 with foraminotomy and partial facetectomy bilaterally at L4 and L5 with decompression of four nerve roots, instrumentation L4-L5. (Tr. 846-47.) This procedure occurred on May 5, 2009. (Tr. 846.) Following the operation, Birton attended

physical therapy at Memorial Regional Rehabilitation Center, where she presented with further complaints of low back and anterior posterior leg pain, as well as frequent exacerbations of fibromyalgia-like symptoms through her upper thoracic spine and lower extremities.  (Tr. 933.)  Birton estimated the pain at its worst was 8/10.  (Tr. 930.)

On December 8, 2009, Dr. Randolph Ferlic diagnosed Birton again with carpal tunnel syndrome of the right side.  (Tr. 867-68, 935.)  Birton began physical therapy for her hand at South Bend Orthopaedics, and received steroid injections in the right middle finger.  (Tr. 863.)  However, the medical records as of January 28, 2010, indicate that her status was "worse."  (Tr. 863.)  Later, Birton began treatment with a new physician, Dr. Ziboh, presenting with complaints of continued lower back pain, and she continued to see Dr. Deleeuw for pain management.  (Tr. 780.)

On February 2, 2010, Birton sought treatment at the Memorial Hospital of South Bend Emergency Center for right shoulder pain leading into the back of her neck.  (Tr. 859.)  Dr. Mark Monahan's physical examination revealed Birton's pain in the right neck with movement going the course of the trapezius into the right shoulder, as well as a right upper back with a positive trigger point in the right shoulder with pain.  *Id.*  Dr. Monahan treated the pain with an injection of 2% lidocaine and discharged Plaintiff with a prescription for Vicodin.  *Id.*  Dr. Monahan's diagnostic impression

included right trapezial pain and probable fibromyalgia. *Id.*
Plaintiff continued physical therapy for the treatment of her pain
at South Bend Orthopaedics at least through February 24, 2010.
(Tr. 860.)


Evidence Regarding Mental Impairments

In addition to her physical maladies, Birton suffered from
mental impairments as well. A January 22, 1998 statement of
history written by Dr. Jobe for the Michigan Disability
Determination Service noted that Birton was diagnosed with major
depression disorder in 1997 and had a GAF score of 60. (Tr. 700,
712.) Dr. Jobe prescribed Paxil, Wellbutrin and Elavil for her
depression. (Tr. 704.) He also noted Birton was often tearful for
no reason, had a loss of energy, and complained of severe fatigue,
irritability, decreased memory, and concentration. (Tr. 707.)

On January 20, 1998, a DDS-selected psychiatrist, Dr. Jorge
Zuniga, conducted a consultative examination for Social Security -
he found Birton was depressed, anxious, and tearful at times. (Tr.
714.) He also found her to have dysthymia, a personality disorder
not otherwise specified, and a GAF score of 68. *Id.*

On April 27, 1999, Plaintiff visited Dr. William Kole,
presenting with symptoms of depression. (Tr. 660.) Dr. Kole noted
Birton suffered from moderate depression based upon a Beck's
Depression Inventory Score of 26. (Tr. 660, 665.)

8

On January 24, 2001, another DDS-selected psychiatrist, Dr. F. Qudir, conducted a consultative examination of Birton, finding her to have a depressed mood, sleep disturbances, a dysthymic disorder, a history of S/P strike, scoliosis, asthma, and back pain, and a GAF score of 50. (Tr. 524-25.) On October 23, 2001, another DDS-selected psychiatrist, Dr. Rownak Hasan, conducted a mental status examination for Social Security - he found her to have occasional short-term memory problems, mood swings, anxiety, a poor sleep pattern, a history of scoliosis and back pain, an adjustment disorder with mixed emotional features, a mood disorder due to chronic pain, and a GAF score of 55-60. (Tr. 520.) On a "Medical Source Statement of Ability to do Work-Related Activities (Mental)," Dr. Hasan opined that Plaintiff had a slight restriction with regard to understanding and remembering detailed instructions, a moderate restriction for carrying out detailed instructions, and a moderate restriction for the ability to make judgments on simple work-related decisions. (Tr. 521.) He further opined that Birton had a slight restriction for interacting appropriately with the public, as well as moderate limitations for interacting appropriately with supervisors and co-workers, responding appropriately to work pressures in a usual work setting, and for responding appropriately to changes in a routine work setting. (Tr. 522.) He noted that Birton's depression supported this assessment. (Tr. 521-22.)

On June 18, 2007, a DDS-selected psychologist, Dr. Terrance Mills, conducted a consultative examination of Birton for Social Security - he found her to have a dysthymic disorder, fibromyalgia, oesteoarthritis, COPD, headaches, and left hand carpal tunnel syndrome, as well as a GAF score of 45. (Tr. 367.)

On April 17, 2008, a DDS-selected psychologist, Dr. Ibrahim Youssef, conducted another consultative examination of Birton for Social Security - he found her to have a constricted affect, a mood between sad and irritable, major depression, a history of asthma, hypertension, COPD, and fibromyalgia, and a GAF score of 50. (Tr. 740-41.)

On April 30, 2008, SA reviewer, Dr. Syd Joseph, checked off a mental FGC form listing Plaintiff as moderately limited in the following areas: the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances, the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, the ability to respond appropriately to changes in the work

10

setting, and the ability to set realistic goals or make plans independently of others. (Tr. 744-45.) Dr. Joseph also found Birton to have major depression - single episode, listed under 12.04 Affective Disorders. (Tr. 751.) Lastly, Dr. Joseph opined that Birton had moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 758.)

On February 20, 2008, Birton began treatment at the Comprehensive Counseling Centers PC with Dr. Chalakudy Ramakrishna. (Tr. 779.) Dr. Ramakrishna found Birton to be withdrawn and sad, to have bipolar disorder, and to have a GAF score of 65. *Id.* After other visits, by May 28, 2008, Dr. Ramakrishna diagnosed Birton with major depression, and gave her a GAF score of 75. (Tr. 775.) He also increased her Zoloft from 150 mg to 200 mg. *Id.*

On January 12, 2010, at the request of her physician Dr. Ziboh, Birton began counseling with Frances Touhey, M.S.W. (Tr. 941.) She presented with mood swings and crying spells, and distracted concentration affected by pain. *Id.* Touhey noted that Birton reported she was raped by a stranger at age 7, and that she had suicidal ideation in 2004 resulting in inpatient treatment. (Tr. 942, 947.) Touhey further stated in a mental status evaluation that Birton had a dysthymic/depressed and tearful affect/mood. *Id.* She diagnosed Birton with depressive features. (Tr. 943.)

11

Plaintiff's Hearing Testimony

During the hearing before ALJ Neary, Birton testified as follows. She last worked at McDonald's in 1997, and has not worked since then because of pain in her lower back. She had fusion surgery in May 2009, which brought her pain level down from a constant 10 to a 7 or 8. (Tr. 31, 37.) At the time of the hearing, she was being treated by Dr. Ralph Carbone, an orthopedic specialist, and receiving medications and injections to help with her pain. *Id.* She suffers from drowsiness and a lack of concentration as a side effect of her medications and injections. (Tr. 31.) Therefore, Birton thought she would have difficulty working 8 hours a day, 5 days a week. (Tr. 39.) She had been participating in physical therapy since the surgery, which she did not think was effective, but the lighter "at-home" exercises helped. (Tr. 37-38.) Birton suffers from a sharp, stabbing, "pinching-like needle" pain that worsens with cold weather. (Tr. 32, 38.) She said standing and sitting for long periods of time aggravates the pain, and she is only able to stand 2 or 3 minutes without pain. *Id.* She can only sit 20-30 minutes, and walk a block and a half without pain. (Tr. 32-33.) To relieve the pain, she has to stand up for a few minutes, then return to a sitting position, eventually needing to lie down every 2-3 hours. (Tr. 39-40.)

Birton's hands bother her as well, and she has carpal tunnel syndrome in her right hand. (Tr. 33.) She has trouble lifting, grabbing, reaching, and writing for a long period of time. *Id.* She was diagnosed with fibromyalgia and feels pain in her neck, lower back, arms, hips, and thighs, limiting her ability to raise, reach, walk, and sit. (Tr. 42-43.) Plaintiff also has migraines about every few weeks, lasting one or two days, forcing Plaintiff to lie down. (Tr. 43-44.) Birton suffers from asthma, which is activated by a change in the weather or excitement, and treated with an inhaler and Prednisone when needed. (Tr. 45-46.) She has depression and anxiety, and takes Zoloft. (Tr. 41.) The medication has been effective, but has not eliminated the symptoms of her depression and anxiety. *Id.* Birton stated she suffers from hives, an inability to sleep, crying spells, and a low energy level. *Id.* Her depression and anxiety limit her concentration, and she claims she is verbally violent with others. (Tr. 46-47.) Birton states she is verbally violent because she has not been on medication for about two months due to lack of insurance. (Tr. 47.)

Birton spends her days relaxing, watching television, and taking her medications when she has them. (Tr. 34.) She is able to dust, but her daughter does the rest of the housework. *Id.* Additionally, she sleeps, reads the Bible, and listens to music. (Tr. 36.) Birton testified for the past 6 years, she has spent

her time going back and forth to hospitals and doctors for treatment. (Tr. 35.) She does not willingly leave the house, and she does not drive. (Tr. 36.)


VE Hearing Testimony

The VE testified at the ALJ hearing. Birton's past work experience included work as a clerk (DOT #209.562-010; light and skilled), a housekeeper (DOT #321.137-101; light and skilled), and as a short order cook (DOT #313.374-014; light and semiskilled). (Tr. 270). For the ALJ's first hypothetical, the VE stated that for an individual aged 39, with a high school education and no prior work experience, who is limited to work at the sedentary level and who is limited to occupations which do not require concentrated exposure to pulmonary irritants or complex or detailed tasks, there are jobs that exist in significant numbers that the individual could perform. (Tr. 49.) The types of jobs that would accommodate such limitations would include jobs such as a "surveillance monitor," "call-out operator," and "food and beverage order clerk." (Tr. 49-50.)

The ALJ's second hypothetical asked the VE whether an individual of the same age, education, and past work experience as Birton, and who had the "limitations consistent with Plaintiff's testimony presented," would be capable of performing any jobs that exist in significant numbers in the national economy. (Tr. 50.)

The VE testified that with those limitations, there would not be any jobs that exist in significant numbers in the national economy. *Id.* He further testified that if an individual were unable to complete a normal workday or workweek due to moderate, 15% limitations, that this would eliminate competitive employment. (Tr. 53.) And, if an individual has a moderate limitation with regard to working an 8 hour work day, which Plaintiff's attorney defined as losing one hour of work per day, then that individual would be unable to find competitive employment. (Tr. 54.) Further, the VE determined that if an individual has a moderate limitation with getting along with co-workers or peers without distracting them, that it will be hard for that individual to do a job. (Tr. 56.) Lastly, the VE testified that taking a narcotic pain medication, which may cause moderate drowsiness and limited concentration, would also make it hard for an individual to do a job. (Tr. 56-57.)


## DISCUSSION

### Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.* Substantial evidence is defined as "such relevant evidence as a

reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In determining whether substantial evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings.  *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB or SSI benefits under the Social Security Act, the claimant must establish that she is disabled.  To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

> Step 1:   Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.
>
> Step 2:   Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months?  If not, the claim is disallowed; if yes, the inquiry proceeds to

Step 3.

Step 3:   Does the claimant have an impairment or
combination of impairments that meets or
equals the severity of an impairment in the
SSA's Listing of Impairments, as described in
20 C.F.R. § 404, Subpt. P, App. 1?  If yes,
then claimant is automatically disabled; if
not, then the inquiry proceeds to Step 4.

Step 4:   Is the claimant able to perform his past
relevant work?  If yes, the claim is denied;
if no, the inquiry proceeds to Step 5, where
the burden of proof shifts to the
Commissioner.

Step 5:   Is the claimant able to perform any other work
within his residual functional capacity in the
national economy: If yes, the claim is denied; if
no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(I)-(v) and 416.920(a)(4)(I)-(v); *see
also Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case, the ALJ found that Birton suffers from the
following severe impairments: fibromyalgia, disorders of the back,
right-sided carpal tunnel syndrome, asthma/COPD, depression/mood
disorder, and PTSD.  (Tr. 15.)

The ALJ further found that Birton did not meet or medically
equal one of the listed impairments in 20 C.F.R. Part 404, Subpart
P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926)).  (Tr.
15).  ALJ Neary then determined that Birton has the residual
functional capacity "to perform sedentary work as defined in 20 CFR
416.967(a) except that she is limited to simple, repetitive tasks.
She must also avoid concentrated exposure to temperature extremes
and other pulmonary irritants."  (Tr. 16.)  Based on Birton's RFC,

17

the ALJ found that Birton would be capable of working as a surveillance system monitor, call out operator, and food and beverage order clerk. (Tr. 21-22.)

Birton believes that the ALJ committed several errors requiring reversal. Birton sets forth three main arguments. First, she argues that the ALJ erred at his step three determination that Birton's impairments do not meet or medically equal any impairment that appears in the Listing of Impairments. Second, Birton contends that the ALJ relied on an incomplete hypothetical. Third, she argues that the ALJ erred in finding Birton's subjective symptoms to be not credible and failing to contact Birton's other treating physicians.

Step 3 Determination

First, Birton argues that the ALJ performed an improper Step 3 determination when he found that Birton's impairments do not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, Birton argues that her fibromyalgia, in combination with her back pain, medically equals the Listing Requirement of 1.04, "Disorders of the Spine." (DE #22, pp. 13-15.)

The ALJ stated in his opinion that "[t]here is no medical evidence of record and no medical opinion of record to support a finding that the claimant meets or equals the requirements of any

of the listings in the Regulations, including 1.00, 3.00, and 12.00." (Tr. 15.) The ALJ then went on to discuss in detail whether the criteria for the mental disorders listings were satisfied, discussing Birton's hearing testimony and medical evidence in the record. (Tr. 15-16.)

Importantly, Plaintiff has the burden of proof to demonstrate that she has medical conditions which meet, or are equal in severity to every element of a listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *Pope v. Shalala*, 998 F.2d 473, 480 (7th Cir. 1993) (overruled on other grounds)(finding the applicant must satisfy all of the criteria in the Listing in order to receive an award of disability insurance benefits under step three.) Here, Birton seems to concede that fibromyalgia is not itself a Listing, but instead asserts that the combination of her fibromyalgia and back pain equal the requirements in Listing 1.04C.

Listing 1.04C provides in relevant part:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> *       *       *       *
> (C) Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Listing 1.04. Yet, Plaintiff fails to point to evidence in the

record showing that she meets the Listing for 1.04C.  To the extent Birton contends that her use of a cane shows an "inability to ambulate effectively," under Listings 1.00(B)(2)(b)(1) and 1.04(C), this argument fails.  20 C.F.R. Part 404, Subpt. P., App. 1 § 1.00B(2)(b)(1) states that ineffective ambulation is defined as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both arms.  However, the reference to using a cane in the medical record only refers to a cane (singular), and Birton does not argue otherwise.  It is well settled that "[a] single cane does not constitute a 'hand-held assistive device' under the listing [1.00B(2)(b)(1)], as it does not limit the functioning of both upper extremities."  *Tolbert v. Astrue*, No. 1:09-CV-01348-TWP-TAB, 2011 WL 883927, at *8 (S.D. Ind. Mar. 11, 2011); *see also White v. Astrue*, No. 08 C 5441, 2009 WL 2244635, at *4 (N.D. Ill. July 28, 2009) (requiring evidence in the record of a need to walk using a walker, two crutches, or two canes to find inability to ambulate effectively).  Thus, there is insufficient evidence to demonstrate that Birton met all of the criteria of Listing 1.04(C).

To the extent Birton attacks the ALJ's analysis at Step 3 as "perfunctory," this Court disagrees. (DE #22, p. 15.)  First, the Seventh Circuit has rejected the argument that the ALJ's failure to explicitly refer to the relevant listing alone necessitates

reversal and remand. *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004). Second, in Step 5, the ALJ did review in detail Birton's testimony regarding her physical ailments, including back pain, physicians notes, and other medical evidence in the record. (Tr. 16-20.) "Because it is proper to read the ALJ's decision as a whole . . . [the court can] consider the ALJ's treatment of the record evidence in support of both his conclusions at steps three and five." *Rice*, 384 F.3d at 370 n.5.

Finally, with regard to the argument that Plaintiff had a medical equivalent, "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6P. In this case, there is no expert in the record opining that Birton had a medical equivalent to an impairment in the listing of impairments. As such, this Court finds that the ALJ did make a proper finding at Step 3.


<u>Credibility</u>

Birton complains that the ALJ improperly discredited Birton's testimony solely because it seemed in excess of the "objective" medical evidence. The ALJ did find that "[a] more restrictive assessment of [Plaintiff's] physical residual functional capacity (especially one that would be consistent with her rather extreme

testimony regarding her functional limitations) is not possible, given the lack of supporting medical evidence (including lack of muscle atrophy, lack of significant loss of grip strength, or lack of loss of fine finger manipulative ability) and the lack of a corroborating medical opinion of record." (Tr. 20.)

Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). However, when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Clifford v. Apfel*, 227 F.3d 863, 871-72 (7th Cir. 2000)). "In assessing a claimant's credibility, the ALJ must consider subjective complaints of pain if the claimant can establish a medically determined impairment that could reasonably be expected to produce the pain." *Indoranto*, 374 F.3d at 474 (citing 20 C.F.R. § 404.1529, SSR 96-7p; *Clifford*, 227 F.3d at 871). Further, "the ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence." *Id.* Instead, the ALJ must make a credibility determination supported by record evidence and be sufficiently specific to make clear to the claimant

and to any subsequent reviewers the weight given to the claimant's statements and the reasons for that weight. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

In evaluating the credibility of statements supporting a Social Security Application, the Seventh Circuit Court of Appeals has noted that an ALJ must comply with the requirements of Social Security Ruling 96-7p. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). This ruling requires ALJs to articulate "specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p. Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement including:

1. The individual's daily activities;

2. The location, duration, frequency and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effect of any medications the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and

> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; *see also Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003).

The ALJ failed to discuss the 96-7p factors. For example, he did not consider her daily activities, level of pain or symptoms, aggravating factors, medication, or justify the finding with specific reasons. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (because "the ALJ did not analyze the factors required under SSR 96-7p," "the ALJ failed to build a logical bridge between the evidence and his conclusion that [claimant's] testimony was not credible.").

Here, the ALJ improperly used boilerplate language, finding her testimony "rather extreme" given "the lack of supporting medical evidence," without articulating specific reasons in assessing the credibility of Birton. This language fails to specify which of Birton's statements are credible (and which the ALJ discredited), thus there is no basis to review whether the ALJ's conclusion is supported by substantial evidence. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)(reviewing similar language and finding the statement by a trier of fact that the witness's testimony is "not entirely credible" yields no clue to what weight the trier of fact gave the testimony.").

Although the ALJ asserts that there is no medical evidence to

24

support Birton's testimony about her limited functioning and pain, the record does indicate that Birton was diagnosed with fibromyalgia, and prescribed pain medications. (Tr. 347.) Indeed the ALJ does not dispute that Birton has fibromyalgia. (Tr. 15.) The ALJ's listed reasons discrediting her testimony (that there is a lack of medical evidence, muscle atrophy, or loss of grip strength), are not sufficient to sustain his credibility findings. The Seventh Circuit has recognized the subjective nature of the symptoms of fibromyalgia, stating, "[t]here are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and - the only symptom that discriminates between it and other diseases of rheumatic character - multiple tender spots . . . that when pressed firmly cause the patient to flinch." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). In *Sarchet*, the Seventh Circuit discussed fibromyalgia as a "common but elusive and mysterious disease." *Id*. at 306. Moreover, that Court criticized an ALJ for, *inter alia*, depreciating the gravity of a claimant's fibromyalgia because of the lack of any evidence of objectively discernable symptoms. *Id*. at 307; *see also Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998)(noting "fibromyalgia is very difficult to diagnose, that no objective medical tests reveal its presence, and that it can be completely disabling.").

Thus, in this case, the ALJ should not have discredited

25

Birton's testimony merely because of the alleged lack of supporting medical evidence in the record - indeed, there is no test to show the presence or severity of the pain of fibromyalgia. The facts of the record *may* leave room for an ALJ to reach the conclusion that ALJ Neary reached; however, because he did not fully set forth his analysis in the decision, the ALJ committed an error of law and reversal is required. This case must be remanded so the credibility of Birton is properly addressed.

Because this Court finds that the ALJ's credibility determination was flawed, it need not reach Birton's final argument that the ALJ erred in relying on the VE testimony after giving the VE an incomplete hypothetical. On remand, the ALJ is reminded that the ALJ must orient the VE to the totality of a claimant's limitations. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). "Among the limitations the VE must consider are deficiencies of concentration, persistence and pace." *Id.* (citing *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir.2009); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir.2003); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)). "[T]he most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." *O'Connor-Spinner*, 627 F.3d at 619.

The Court in *O'Connor-Spinner* noted the following:

> In most cases, however, employing terms like "simple, repetitive tasks" on their own will

26

not necessarily exclude from the VE's
consideration those positions that present
significant problems of concentration,
persistence and pace. The ability to stick
with a given task over a sustained period is
not the same as the ability to learn how to do
tasks of a given complexity. . . .
. . . . As discussed, limiting a hypothetical
to simple, repetitive work does not
necessarily address deficiencies of
concentration, persistence and pace.
    We acknowledge that there may be
instances where a lapse on the part of the ALJ
in framing the hypothetical will not result in
a remand. Yet, for most cases, the ALJ should
refer expressly to limitations on
concentration, persistence and pace in the
hypothetical in order to focus the VE's
attention on these limitations and assure
reviewing courts that the VE's testimony
constitutes substantial evidence of the jobs a
claimant can do.

*Id.* at 620-21 (citations omitted).


<u>CONCLUSION</u>

    For the reasons set forth above, the Commissioner of Social

Security's final decision is **REVERSED** and this case is **REMANDED** for

proceedings consistent with this opinion pursuant to sentence four

of 42 U.S.C. section 405(g).



DATED: **November 26, 2012**          /s/ RUDY LOZANO, Judge
                                      **United States District Court**